# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

ANTWAN GLENN,

                Petitioner,             :     Case No. 1:12-cv-706

   - vs -                           District Judge Timothy S. Black
                                   Magistrate Judge Michael R. Merz

WARDEN, Ross Correctional Institution,
                                  :

                Respondent.

---

# REPORT AND RECOMMENDATIONS

---

This habeas corpus case is before the Court for decision on the merits. The Petition was filed September 18, 2012. The Warden responded with a Motion to Dismiss (Doc. No. 6) which District Judge Black denied on Magistrate Judge Litkovitz's recommendation (Doc. Nos. 9, 14). The Warden then filed a Return of Writ (Doc. No. 15). Petitioner has failed to file a reply within the time allowed by Judge Litkovitz.

Petitioner Antwan Glenn was convicted of murder and aggravated robbery in the Hamilton County Common Pleas Court on March 23, 2009, and sentenced to the imprisonment from which he seeks release (Petition, Doc. No. 1, ¶¶ 1, 2, 5, PageID[1] 1). Glenn appealed to the First District Court of Appeals which affirmed the conviction. *State v. Glenn*, 2011-Ohio-829, 2011 Ohio App. LEXIS 737 (1st Dist. Feb. 25, 2011). A further appeal to the Ohio Supreme Court was rejected. 128 Ohio St. 3d 1516 (2011), and this timely[2] habeas petition followed.

---

[1] The Court's electronic filing system (CM/ECF) automatically affixes a distinctive page number (shown in the upper right-hand corner as PageID) to each page of each filed document. All citations to the filed record in this case must refer to the PageID number.
[2] Respondent moved to dismiss based on the claim that the Petition was filed outside the applicable one-year statute

Glenn pleads the following grounds for relief:

> **Ground One**:  The trial court erred to Glenn's prejudice by overruling his *Batson* challenge to the State's dismissal of a minority member of the jury pool.
>
> **Supporting Facts:**  It is prejudicial erro[r] for trial court to deny a defendant's *Batson* challenge when the State excuses a minority member of the jury pool without stating race neutral reasons.
>
> **Ground Two:**  Antwan Glenn was denied due process and prejudiced by the State's prosecutorial misconduct.
>
> **Supporting Facts:**  When the prosecutor a[s]ks leading questions of his own witnesses, it unfairly prejudices a defendant's right to a fair trial.
>
> **Ground Three:**  Abused [sic] of Discretion
>
> **Supporting Facts:**  Whether the trial court committed reversible error by permitting irrelevant and prejudicial evidence to be presented by the State of unrelated alleged bad acts of defendant and co-defendant in this case.
>
> **Ground Four**:  Improper conduct of the assistance [sic] prosecutor implying Glenn records of other bad acts.
>
> **Supporting Facts:**  Whether a defendant is denied the due process of law by improper conduct of the assistant prosecutor in trying their case.

(Petition, Doc. No. 1.)

The First District Court of Appeals found the following underlying facts:

> **[\*P2]** Glenn's convictions arose out of the robbery and death of Reginald Rolland in the early morning hours of June 18, 2008. Glenn had been indicted for aggravated murder, murder, and aggravated robbery, with accompanying gun specifications. The state proceeded against him as a principal or complicitor. Jovon Davis, Nikkia Sullivan, and James Johnson were also charged with the same crimes. Sullivan and Johnson agreed to testify truthfully

---

of limitations.  Judges Litkovitz and Black rejected that defense and it is now the law of the case that the Petition was timely filed.

for the state in exchange for a plea bargain that provided incarceration for ten to 15 years.

[*P3] At trial, the state presented evidence that on the night of June 17, 2008, Glenn had developed a plan with Sullivan and Davis to rob people in the Avondale neighborhood of Cincinnati. The plan involved Sullivan using her cellular phone to call or send a text message to men whom she knew and enticing them to meet her with the promise of sex. When the men arrived to meet her, Glenn and Davis would rob them at gunpoint.

[*P4] Sullivan testified that a man named Chris became the group's first victim. Sullivan called Chris and lured him to the Commodore Apartments on Reading Road, and in response to Davis's text messages, she led him up a dark stairwell where Glenn and Davis were waiting. Glenn and Davis robbed Chris at gunpoint.

[*P5] Next, Sullivan testified, the group attempted to rob a man who met her near Lexington Park. When the man refused to walk to the park with her, Sullivan texted Davis, who was waiting nearby in a car with Glenn, for advice. Davis directed her to abort the plan and to let the potential victim go.

[*P6] But the group reunited, and after scanning through Sullivan's cellular phone directory, they chose Reginald Rolland as their next victim. Either Glenn or Davis chose a house at 878 Hutchins Street as the location for the robbery. Sullivan recalled that she had accompanied Glenn and Davis there in the past when they had sold drugs to the occupants. Sullivan contacted Rolland, and he agreed to meet her at the Hutchins Street address.

[*P7] Before going to Hutchins Street, Glenn, Davis, and Sullivan met with Johnson, whom Davis had called and asked if he wanted to "hit a lick." Johnson agreed to participate, and the four drove to Hutchins Street in the car that Johnson had been driving, an "[un]noticeable" Ford Contour that belonged to Jasmain Grier, the girlfriend of one of Johnson's friends. Davis drove the Contour, Glenn sat in the front passenger seat, and Sullivan and Johnson sat in the back of the car. On the way to Hutchins Street, Glenn removed and smoked a cigarette from a pack of Newport cigarettes that Sullivan had brought into the Contour.

[*P8] Davis first parked the car in front of the house chosen for the robbery but later moved it down the street. Sullivan received a call on her cellular phone from Rolland and confirmed that he was

3

on his way to meet her. Then all three men exited from the car armed with guns that Davis had distributed and hid, waiting for Rolland's arrival. Sullivan stood in front of the house to greet Rolland.

[*P9] When Rolland arrived, Sullivan led him to the back porch. As planned, Johnson first approached Rolland, pointed his gun at him, and told him to "lay it down." But Rolland pulled a 9-mm handgun out of his waistband and shot at Johnson. Johnson fired back with a .40-caliber Smith & Wesson handgun and then ran. As he fled from the scene with a bullet wound in his leg, Glenn and Davis fired four or five shots at Rolland.

[*P10] Rolland was shot twice and left dying from these wounds on top of Sullivan on the porch. Sullivan, who had also been shot, grabbed Rolland's gun, moved out from underneath him, and left the porch. She then realized that Glenn, Davis, and Johnson had fled. She testified that at 3:15 a.m., she texted Davis, "Im hit," and then "Come and get me." After receiving no response, she attempted to walk away from the house, collapsed from her gunshot injuries, and called 911. She threw Rolland's gun in an attempt to "ditch it" before the police arrived.

[*P11] Responding officers, including one who had actually heard six or seven gunshots, found Rolland's gun in the neighboring yard. They also discovered Rolland, who soon died, and Sullivan, whom they transported to the hospital.

[*P12] Johnson's aunt and cousin drove him to the hospital. On the way there, he gave to his cousin the .40-caliber Smith & Wesson that he had used to shoot at Rolland. The police recovered the gun from Johnson's cousin when she was detained at the hospital as part of a protocol for those who transported gunshot victims.

[*P13] The police searched the Ford Contour that had been left at the scene unlocked and with the keys in the ignition. They found a pack of Newport cigarettes containing Glenn's fingerprint, Sullivan's purse, Johnson's red cellular phone, and two other cellular phones located in the console between the driver's seat and the passenger's seat. One of the phones had a photograph of Davis and Sullivan as the screen saver, and the other phone's screen saver had written on it Davis's nickname. Those two phones had been subscribed to by the mother of Jovon Davis, and someone named "Jovan" [sic] had called the cellular service provider, Verizon, hours after Rolland had been shot, reporting the phones as lost and

directing the transfer of the phone numbers to new phones. Davis was in possession of a phone with one of these numbers when he was arrested.

**[\*P14]** Cellular phone records were located for a subscriber named "Antwoan Glenn." These records showed the signal from that phone pinging off cell towers near Hutchins Road around 3:00 a.m., and that the phone had later been used to call Sullivan's cellular phone at 3:50 a.m. and Johnson's cellular phone at 4:10 a.m. Further, the records showed communication between that phone and Davis's phone at 6:00 a.m.

**[\*P15]** Importantly, at trial, the state presented evidence of the call and text history of the cellular phones, which demonstrated Sullivan's communication with Chris and Rolland and the communication between Davis, Sullivan, Glenn, and Johnson in the early morning hours of June 18, 2008.

**[\*P16]** Ballistic evidence demonstrated that the two bullets found in Rolland's body were from a .40-caliber Smith & Wesson handgun. But the bullets could not be tied specifically to Johnson's handgun, and Glenn's and Davis's guns were never located. An expert was able to determine, however, that Rolland had shot Johnson and that Johnson had shot Sullivan.

**[\*P17]** Although Sullivan and Johnson first lied about their parts in the robbery and murder of Rolland, they eventually confessed. Their prior statements were admitted into evidence for the jury's consideration, and they testified fully about the details of the plea agreements that they had entered into.

**[\*P18]** The jury found Glenn and Davis guilty of murder and aggravated robbery, but acquitted both of them of aggravated murder and Glenn of all firearm specifications. Glenn filed post-verdict motions for an acquittal, a new trial, and a "mistrial." The trial court overruled the motions and sentenced Glenn to consecutive terms of fifteen years' to life imprisonment for the murder and to ten years for the aggravated robbery. This appeal followed.

*State v. Glenn, supra,* ¶¶ 2-18.  Glenn's habeas corpus claims will be analyzed against that backdrop of factual findings.

# Analysis

**Ground One:  Denial of a *Batson* Challenge**

In his First Ground for Relief, Glenn complains of the trial court's failure to accept a *Batson* challenge, essentially raising an equal protection of the laws claim.

*Batson v. Kentucky*, 476 U.S. 79 (1986), prohibits race-based peremptory challenges by a prosecutor.  A state criminal defendant can establish a prima facie case of purposeful racial discrimination in the selection of jurors solely by proof of peremptory challenges to exclude members of the defendant's race. *Id.*

A trial court must use a three-step process to evaluate a *Batson* claim.  First, the opponent must make a prima facie showing that the proponent of the strike has exercised a peremptory challenge on the basis of race.  The burden then shifts to the proponent to articulate a race-neutral reason for the challenge.  Finally, the trial court must determine if the opponent has carried his burden of proving purposeful discrimination.  *Purkett v. Elem,* 514 U.S. 765 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991).  To make a prima facie showing, a defendant must show that he is a member of a cognizable racial group, that a challenge has been exercised to remove a venireperson of the same race, and any additional facts and circumstances from which an inference could be drawn that the prosecutor had used the peremptory challenge in a race-based manner.  *Batson,* 476 U.S. at 79.  The defendant is entitled to rely on the fact that the peremptory challenge process is one in which those who are of a mind to discriminate on the basis of race are able to do so.  *Id.*  A trial judge's conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous.  *Hernandez*; *supra*; *United States v. Tucker*, 90

F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990)

The fact that the evidence would have supported a challenge for cause is sufficient to

demonstrate that it is race-neutral. *Batson*, 479 U.S. at 97. A *Batson* error is never harmless, but

rather is a structural error. *United States v. McFerron,* 163 F.3d 952 (6th Cir. 1998), relying on

*Arizona v. Fulminante,* 499 U.S. 279 (1991).

Glenn presented his *Batson* claim as his First Assignment of Error on direct appeal. The

First District decided that claim as follows:

> [*P19] In his first assignment of error, Glenn argues that the state
> peremptorily challenged an African-American prospective juror
> because of his race, in violation of his equal-protection rights
> under *Batson v. Kentucky*. [(1986), 476 U.S. 79, 106 S.Ct. 1712, 90
> L. Ed. 2d 69.] A *Batson* claim is adjudicated in three steps. If the
> opponent of the peremptory challenge makes a prima facie case of
> racial discrimination, then the proponent of the challenge must
> provide a racially neutral explanation for the challenge. [Id. at 96-
> 98.] Finally, the trial court must determine based on all the
> circumstances if the opponent has proved purposeful
> discrimination. [Id. at 98.] A trial court's conclusion that the
> proponent did not possess a discriminatory intent will not be
> reversed on appeal unless it is clearly erroneous. [State v.
> Hernandez (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310,
> following Hernandez v. Hew York (1991), 500 U.S. 352, 111 S.Ct.
> 1859, 114 L.Ed. 2d 395.]
>
> [*P20] During voir dire, prospective juror Randolph Bennett, an
> African-American, was asked a series of questions about his
> background and his ability to be a juror. Bennett repeatedly had
> difficulty hearing and at one point asked the prospective juror next
> to him what the court was asking. Bennett also repeatedly qualified
> his answers with "hopefully" and gave confusing answers, as
> demonstrated by excerpts from the voir dire colloquy:
>
> [*P21] "Prosecutor: * * * I talked yesterday to [a] lot of jurors
> about case consideration, using co-defendants to testify about what
> they had done and what these two individuals had done, and how
> you would treat that. Did you follow what I was talking about?
>
> [*P22] "Bennett: Yeah. You said some people bargain.

[*P23] "Prosecutor: And I guess my question is: Do you feel that you would be, like, competent or able to really give the case, like, everything that you should, and make a fair decision, be able to process all the information that's coming in, that you would have to like listen to and figure it out where it all fits?

[*P24] "Bennett: Hopefully I won't have a problem.

[*P25] "Prosecutor: And, again, there's only one person that can answer that, which would be you. Could there be a problem that—again, not a problem, but just a concern that you might have that you might miss something or not understand it the way that it really deserves to be understood?

[*P26] "Bennett: It's hard to say because I don't know the other side.

[*P27] "* * *

[*P28] "The Court: All right. Mr. Bennett, can you sit and listen to the case and evaluate the evidence and make a decision on the case whether the State's proven their case beyond a reasonable doubt or not?

[*P29] "Bennett: I feel I could.

[*P30] "The Court: You think you can?

[*P31] "Bennett: Hopefully.

[*P32] "* * *

[*P33] "Attorney [for Davis]: Are you comfortable with that instruction, that the testimony of an accomplice should be viewed with grave suspicion and weighed with great caution?

[*P34] "Bennett: Please repeat that.

[*P35] "Attorney [for Davis]: Are you comfortable with the rule: the testimony of a person who you find to be an accomplice—there will be people who are accomplices, people who said, I was involved in the robbery and killing of Reginald Rolland. And they are going to point a finger at my client, okay? That is an accomplice testifying. Are you going to weigh his or her testimony with grave suspicion and with great caution?

8

[*P36] "Bennett: No, I wouldn't."

[*P37] The state used a peremptory challenge to excuse Bennett. Davis's counsel objected to the state's peremptory challenge as a *Batson* violation. In explaining its use of a peremptory challenge to dismiss Bennett, the state said that "[i]t's obvious he has no clue as to what's going on. He * * * cannot hear. He said hopefully a number of times." The court determined that the state had asserted several nonrace-related reasons for the exercise of the peremptory challenge, and that those reasons were supported by the record, and it rejected the *Batson* challenge.

[*P38] We agree with the trial court that a juror's inability to understand and inability to hear the trial proceedings are race-neutral reasons for exercising a peremptory challenge against him. The trial court, which was able to observe Bennett's reaction to the questioning in addition to listening to Bennett's answers, found the state's reasons supported by the record. On this record, we cannot say that the trial court's finding of no discriminatory intent was clearly erroneous. Accordingly, we overrule the first assignment of error.

*State v. Glenn, supra*, ¶¶ 19-38.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

In deciding this claim on appeal, the court of appeals cited the applicable United States Supreme Court precedent and appears to have applied it correctly: it implicitly found that Glenn had established a prima facie case in that both Glenn and the peremptorily excused juror (Bennett) are African-American. It then required the prosecutor to give reasons for exercising the peremptory. The reasons given – lack of understanding and difficulty hearing the

proceedings – are both race-neutral.  The trial judge decided those stated reasons were not a pretext for racial discrimination by finding that there was factual support in the record for each of them.  As the Warden notes, there is actually more record evidence to support the challenge than was recited by the court of appeals (See Return of Writ, Doc. No. 15, PageID 308).  Particularly with objections of this sort, a trial judge's observation of the demeanor of an excused venireman is important.  The record does not reflect any response by defense counsel which would have required the trial judge to find that the prosecutor's explanation was a pretext for racial discrimination.

In sum, the First District's decision was not an objectively unreasonable application of *Batson* and its progeny.  The First Ground for Relief should therefore be dismissed with prejudice.


**Ground Two:  Prosecutorial Misconduct By Asking Leading Questions**


In his Second Ground for Relief, Glenn claims he was denied due process by the prosecutor's examining his own witnesses with leading questions.  This claim was made as Glen's Second Assignment of Error on direct appeal.  The First District decided the second and fourth assignments together; as to the leading questions assignment, it held:

> **[*P53]** Glenn contends that the state asked leading questions during direct examination of Sullivan and Detective Eric Karaguleff. In a leading question, the examiner suggests to the witness the answer desired. [*State v. Drummond*, 111 Ohio St.3d 14, 2006 Ohio 5084, 854 N.E.2d 1038, § 138, citing 1 McCormick, Evidence (5 Ed. 1999) 19, Section 6.] Evid.R. 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." As indicated by the rule, the parties can use leading questions when necessary to develop a witness's testimony, and the trial

court has discretion to allow such questioning. [Id.] Where leading questions are designed to move the testimony along without delay and "merely direct the witness' attention to the topic of inquiry," [*State v. Brown* (1996), 112 Ohio App.3d 583,599, 679 N.E.2d 361.] or facilitate testimony in light of the witness's age, [Id. at 599-600.] nervousness, [*State v. Smith* (1997), 80 Ohio St.3d 89, 110-111, 1997 Ohio 355, 684 N.E.2d 668.] or established difficulty in remembering information, [*Drummond* at ¶ 152.] they are not improper. But a prosecutor's persistent pursuit of an improper line of questioning after an objection has been sustained can be misconduct. [See *State v. Diar*, 120 Ohio St. 3d 460, 2008 Ohio 6266, 900 N.E.2d 565, ¶205.]

**[\*P54]** To obtain a reversal on the basis of improper leading questions by the state, the defendant must demonstrate not only that the questioning was improper, but that it affected the outcome of the trial. [Id.] Where no objection is made at trial, the misconduct must rise to the level of plain error. [*State v. Childs* (1968), 14 Ohio St.2d 56, 236 N.E.2d 545, paragraph three of the syllabus.] Plain error exists only where it is clear that, but for the error, the outcome of the trial clearly would have been otherwise. [See Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus.]

**[\*P55]** Glenn has not specifically identified the questions that he considers to be outside what is permitted under Evid.R. 611(C) and how these questions prejudiced him. Further, he does not argue, and the record does not reflect, that the prosecutor persistently pursued an improper line of questioning. Moreover, Glenn concedes that he must meet the plain-error standard.

**[\*P56]** We conclude that Glenn has failed to demonstrate that the prosecutor's line of questioning was misconduct that rose to the level of error, much less plain error.

*State v. Glenn, supra*, ¶¶ 53-56.

Glenn's Second Ground for Relief should be dismissed with prejudice because it is procedurally defaulted in that his trial attorney made no contemporaneous objections to the leading questions.

The procedural default defense in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982).  Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review.  *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000)(citation omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986);  *Engle*, 456 U.S. at 110;  *Wainwright*, 433 U.S. at 87.  *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia*, 372 U.S. 391 (1963).  *Coleman*, 501 U.S. at 724.

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(en banc); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir.2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
> . . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of*

> *Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error .

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998) — is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012),*citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 131 S. Ct. 185 (2010).

A state appellate court's review for plain error – which is what happened in this case -- is enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F.3d 239 (6th Cir. 2001), *citing Seymour*

*v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604 (6th Cir. 2003).

Even if Glenn had not procedurally defaulted this claim, it is without merit.  Federal habeas corpus is available only to correct federal constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13; 178 L. Ed. 2d 276 (2010)*; Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983).   "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  This Court is unaware of any United States Supreme Court precedent which holds that it is unconstitutional to ask leading questions on direct examination of the prosecution's witnesses.

Therefore the Second Ground for Relief should be dismissed with prejudice.


## Ground Three:  Admission of Prior "Bad Acts" Evidence


In his Third Ground for Relief, Glenn asserts the trial court denied his right to a fair trial by allowing the prosecutor to adduce evidence of prior "bad acts."  Glenn presented this claim to the court of appeals as his Third Assignment of Error.  That court decided the claim as follows:

> **Other Bad Acts Evidence**
>
> **[\*P39]** In his third assignment of error, which we next address, Glenn contends that the trial court erred by admitting evidence of his other bad acts and his prior incarceration, in violation of Evid.R. 404(B) and R.C. 2945.59.
>
> **[\*P40]** Other-acts evidence is generally inadmissible against a defendant in recognition of the substantial danger that a jury will

find the defendant guilty because he has committed the other acts. [See *State v. Knight* (1998), 131 Ohio App.3d 349, 352, 722 N.E.2d 568.] Evid.R. 404(B) and its statutory counterpart, R.C. 2945.59, provide exceptions to the common-law rule with respect to evidence of other acts of wrongdoing. Evidence of other acts is admissible if there is substantial proof that the defendant committed those acts, and if the evidence tends to prove an issue in the case such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. [*State v. Lowe*, 69 Ohio St.3d 527, 530, 1994 Ohio 345, 634 N.E.2d 616, citing State v. Broom (1988), 40 Ohio St.3d 277, 282-283, 533 N.E.2d 682; Evid.R. 404(B); R.C. 2945.59.]

[*P41] Evid.R. 404(B) and R.C. 2945.59 codify an exception to the common-law rule with respect to evidence of other acts of wrongdoing and are construed against admissibility.[Id.] In other words, "the standard for admissibility of other-acts evidence is strict." [Id. at 533.] But evidentiary rulings generally lie within the broad discretion of the trial court and will form the basis for reversal on appeal only upon an abuse of that discretion amounting to prejudicial error. [Evid.R. 103(A); Lowe, 69 Ohio St.3d at 532.]

[*P42] First Glenn challenges the trial court's admission, over his objection, of the testimony concerning the prior alleged aggravated robbery and attempted aggravated robbery that had occurred just hours before Rolland was robbed and murdered. Sullivan testified that she, Glenn, and Davis had lured a man named Chris to an apartment to rob him at gunpoint, and Sullivan also testified about an attempted aggravated robbery of another man who had met Sullivan near a park, but refused to get out of his car and accompany her to the park where Glenn and Davis had been planning to rob him.

[*P43] This court addressed and rejected a similar argument raised by Davis in his appeal. [*State v. Davis*, 1st Dist. No. C-090220, 2010 Ohio 5125.] We held that Sullivan's testimony on the other planned armed robberies that had occurred just hours before Rolland's armed robbery and murder was probative of Davis's preparation and planning involved in the charged offenses and tended to show that all the robberies were part of a common scheme or plan among the defendants. Sullivan's cellular phone records corroborated her testimony. We conclude that this same testimony was also probative of Glenn's preparation and planning for the charged offenses and Glenn's role in the common scheme. Therefore, we hold that the trial court did not abuse its discretion in admitting this testimony for those proper purposes.

15

**[\*P44]** Glenn contends also that Sullivan was permitted to testify that he had been involved in drug dealing. The record confirms that Sullivan did testify that Glenn had previously sold drugs to the residents of the house where she had lured Rolland. But Glenn did not object to this testimony, and any error in its admission does not rise to the level of plain error in light of the other evidence of guilt in the case.

**[\*P45]** Finally, Glenn argues that the trial court erred by allowing into evidence testimony indicating that he had been previously incarcerated in the Hamilton County Justice Center. Glenn claims that this testimony was provided by both Sullivan and William Hillard, a senior criminalist for the Cincinnati Police Department who performed the fingerprint analysis in the case.

**[\*P46]** The record does not demonstrate that Sullivan made any reference to or implication about a prior incarceration, outside of her unobjected-to comments about Glenn's drug dealing, which we have already determined to be insufficient to support a reversal.

**[\*P47]** Hillard's reference to or implication concerning a prior incarceration is more problematic. At trial, Glenn stipulated that his fingerprints were on the fingerprint card that Hillard had used to compare the latent print from the cigarette pack. Despite this stipulation, Hillard testified that, to make his comparison, he had obtained Glenn's fingerprint card that was "on file at the justice center." He also explained that when he had entered the latent print from the cigarette pack into the Automatic Fingerprint Investigative System ("AFIS"), the system provided him with a list of candidates identified by a "jacket number," and that a jacket number was assigned to a particular name and was given to "[a]nybody [who] c[ame] in the justice center."

**[\*P48]** Glenn objected on the grounds not only that Hillard was exposing the jury to his criminal history, but also that he lacked any reason to do so in light of the stipulation. The trial court overruled the objection, noting that the state had not asked how Glenn had come to be at the justice center, and that while Glenn had stipulated that his fingerprint was on the fingerprint card, he had refused to stipulate that his fingerprint was on the cigarette pack.

**[\*P49]** As we have noted, the state generally may not introduce

evidence that tends to show that a defendant committed another crime wholly independent of the offense for which he is on trial. Glenn had stipulated that his fingerprint was on the fingerprint card, rendering Hillard's testimony outside the exceptions set forth in Evid.R. 404(B) and R.C. 2945.59. And Hillard's challenged testimony, considered in context, was such that it could have provided a basis for a reasonable inference that Glenn had prior involvement in other crimes. But the ambiguity in the testimony, coupled with the fleeting nature of it, rendered any error in the admission of the statement harmless beyond a reasonable doubt: the reference was vague, the fingerprint card that was admitted did not refer to any criminal activity, and therefore, in light of the other evidence in the case, there is no reasonable possibility that this testimony contributed to Glenn's conviction. [See Crim.R. 52(A).]

**[\*P50]** Accordingly, we overrule the third assignment of error.

*State v. Glenn, supra*, ¶¶ 39-49.

The trial judge's allowance of testimony about the robbery and attempted robbery that occurred on the same night and involved the same perpetrators was very relevant to prove identity because of the similar *modus operandi*:  luring a potential victim, by a promise of sex with Sullivan, to a place where he could be robbed.  Thus, as the court of appeals held, there was no violation of Ohio evidence law (Ohio R. Evid. 404(B) and Ohio Revised Code § 2945.59) in admitting that evidence.

As to Sullivan's testimony that the place where she lured Rolland was a place where Glen had sold drugs, the court of appeals enforced the contemporaneous objection rule and, as noted above, that is an adequate and independent state ground of decision.

As to the evidence of the origin of Glenn's fingerprints in the possession of the state for comparison with a fingerprint recovered from the cigarette pack, there was a stipulation that made the testimony unnecessary and there was also a contemporaneous objection.  However, the court of appeals found there was no unambiguous testimony that the fingerprint exemplar was obtained from Glenn when he was previously arrested and found any error harmless beyond a

17

reasonable doubt.

The record shows Glenn did not fairly present this claim to the state courts as a federal constitutional claim. Rather, he presented it as a matter of Ohio evidence law, a claimed violation of Ohio R. Evid. 404(B) and Ohio Revised Code § 2945.59. A habeas petitioner who fails to fairly present a claim to the state courts as a constitutional claim has procedurally defaulted on that claim. *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013). Furthermore, it is not clear that there was any constitutional claim to be presented. "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003), noting that the Supreme Court refused to reach the issue in *Estelle v. McGuire*.

The Third Ground for Relief should therefore be dismissed with prejudice.

**Ground Four: Prosecutorial Misconduct**

In his Fourth Ground for Relief, Glenn claims the prosecutor engaged in misconduct by implying Glenn had a prior criminal record. The First District Court of Appeals decided the Second and Fourth Assignments of Error, both of which alleged prosecutorial misconduct, together. As a general standard it held "[t]he test for prosecutorial misconduct is whether the prosecutor's questions or remarks were improper and, if so, whether they prejudicially affect the defendant's substantial rights." *State v. Glenn, supra, citing State v. Smith*, 14 Ohio St. 3d 13 (1984), and S*tate v. Canyon*, 2009 Ohio 1263 (Ohio App. 1st Dist. 2009).

That is substantially the same as the standard embodied in federal case law. On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the

conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181 (1986), *quoting DeChrsitoforo, supra.*; *Wogenstahl v. Mitchell*, 668 F.3d 307, 327-328 (6th Cir.  2012), *citing Smith v. Mitchell,* 567 F.3d 246, 265 (6th Cir. 2009); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005)(citations omitted); *Kincade v. Sparkman*, 175 F.3d 444, 445-46 (6th Cir. 1999)(citations omitted) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)(citations omitted); *accord Summitt v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981)(citation omitted); *Stumbo v. Seabold*, 704 F.2d 910, 911 (6th Cir. 1983)(citation omitted).   The court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).   A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and whether the evidence against the defendant was strong." *Id.*  The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993)(*quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982).

The First District applied that standard as follows:

> **[\*P58]** Glenn argues further that prosecutorial misconduct occurred (1) during opening statement, when the prosecutor

referred to Glenn's alleged participation with Davis and Sullivan in two planned aggravated robberies shortly before committing the offenses against Rolland, and (2) during closing argument, when the prosecutor again referred to Glenn's participation in the planned robberies, as well as denigrating defense counsel and making inflammatory comments.

[*P59] We have already held that Sullivan's testimony about Glenn's alleged participation in two planned armed robberies within hours of Rolland's attempted robbery and shooting death was admissible. In opening statement and closing argument, the prosecutor referred to this admissible testimony, as corroborated by the cellular-phone records, in the context of demonstrating the planning and preparation for Rolland's ambush. Under these circumstances, we find no misconduct by the prosecutor.

[*P60] Glenn identifies as improper four other remarks of the prosecutor in closing argument, none of which he objected to at trial. We reviewed these four remarks in Davis's appeal before holding that Davis had failed to demonstrate a claim for prosecutorial misconduct.[*Davis*, 2010 Ohio 5125, at ¶30-34.] We hold that Glenn, too, has failed to demonstrate a claim for prosecutorial misconduct based on these remarks.

*State v. Glenn, supra*, ¶¶ 58-60. Thus as to the modus operandi testimony, it was not misconduct to use it because it was properly admissible. As to any other comments by the prosecutor which were complained of on direct appeal, the First District enforced the Ohio contemporaneous objection rule, providing this Court with a basis for finding those claims are procedurally defaulted.

Therefore the Fourth Ground for Relief should be dismissed with prejudice.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion,

Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth

Circuit that any appeal would be objectively frivolous.


December 16, 2013.

s/ *Michael R. Merz*

United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).